**E-FILED**
Tuesday, 06 January, 2009  10:04:19 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| WALTER R. LEGG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEVEN AGEE, in his individual | ) | |
| capacity, CHRISTOPHER HUTT, | ) | |
| in his individual capacity, Police | ) | |
| Chief EDWARD PAPIS, in his | ) | |
| individual capacity, the CITY OF | ) | |
| EAST PEORIA, ILLINOIS, | ) | No. 05-cv-1354 |
| a political subdivision of the | ) | |
| State of Illinois, and Illinois State | ) | |
| Police Officers BRIAN GORSUCH, | ) | |
| LARRY HAWKINS, | ) | |
| ROBERT DRUMMOND, KEVIN | ) | |
| LEGATE, KEITH MCELYEA, | ) | |
| DALE KING, and DOUGLAS JONES, | ) | |
| in their individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>O P I N I O N   &   O R D E R</u>

Before the Court are two motions for summary judgment, one filed by

Defendants Agee, Hutt, Papis, and the City of East Peoria ("East Peoria

Defendants") (Doc. 85) and one filed by Defendants Drummond, Gorsuch, Hawkins,

Jones, King, Legate, and McElyea ("MEG Defendants") (Doc. 84).  Also before the

Court are the following motions: Plaintiff's motion to strike the East Peoria

Defendants' summary judgment brief (Doc. 90); the East Peoria Defendants' motion

in limine regarding the testimony of W. Ken Katsaris (Doc. 74); and the East Peoria Defendants' motion in limine to bar the testimony of Dr. Douglas Collins (Doc. 76).

For the reasons set forth below, the Court rules as follows:  Plaintiff's motion to strike is DENIED; Defendants' motion in limine regarding the testimony of Mr. Katsaris is GRANTED; the motion for summary judgment filed by the East Peoria Defendants is GRANTED, in part, and Plaintiff is directed to file his remaining state law battery claims in state court; the motion for summary judgment filed by the MEG Defendants is GRANTED; and Defendants' motion in limine regarding the testimony of Dr. Collins is MOOT.

## FACTUAL BACKGROUND

This is a section 1983 case concerning the alleged excessive use of force by police officers in detaining and transporting a suspect.  On the afternoon of March 31, 2005, Plaintiff Walter Legg went to visit his brother Robert Legg at Robert's residence in East Peoria, Illinois.  Throughout the afternoon and into the night, Plaintiff and his brother consumed two to three fifths of whiskey and at least two 40 ounce bottles of malt liquor.  They also smoked marijuana.  (East Peoria Defendants' Statement of Undisputed Material Facts ("EP Defs.' SUMF") ¶¶ 3-4). Meanwhile, on the same date, officers of the Multi-County Narcotics Enforcement Group ("MEG") obtained a search warrant for Robert Legg's residence.  The warrant directed a search of the house and of Robert Legg and Rebecca A. Pine a/k/a Becky Collins, who were suspected of selling marijuana.  (EP Defs.' SUMF ¶ 9)  Sometime

after midnight, Plaintiff went to sleep on the floor of his brother's living room.  (EP Defs.' SUMF ¶ 6).

At 7 a.m. on April 1, 2005, the MEG unit arrived at Robert Legg's residence along with uniformed East Peoria patrol officers.  (EP Defs.' SUMF ¶ 14).  The MEG officers knocked on the door but did not receive an answer, so they opened the door with a ram and filed into the house.  The officers spread throughout the house and secured each room and person in the residence.  (EP Defs.' SUMF ¶ 16).  The MEG officers observed that Plaintiff was lying on the floor in or near the living room. Plaintiff was extremely intoxicated and had urinated on himself.  (EP Defs.' SUMF ¶ 18).

Officers found Robert Legg in his room downstairs.  He was arrested, handcuffed, led through the living room, and taken outside to a police vehicle. While Robert Legg passed through the kitchen, he saw that Plaintiff was on the floor and that two or three non-uniformed officers were surrounding Plaintiff. Robert Legg saw that one of the officers was positioned above Plaintiff's head and was pinning Plaintiff down on the floor by putting his knee into Plaintiff's back. (EP Defs.' SUMF ¶ 30).  At some point during the raid, Katie Legg – Robert's daughter who lived at the residence – came home.  When she entered the house, she saw plainclothes officers handcuffing Plaintiff on the living room floor.  According to Katie Legg, an officer was holding Plaintiff down with his knee in the area of Plaintiff's shoulder blades.  (EP Defs.' SUMF ¶ 27).

After the MEG officers secured the house, Officer Steven Agee, a uniformed East Peoria police officer, was asked to come inside.  When Officer Agee entered the house, he saw that Plaintiff was on the floor in handcuffs.  (EP Defs.' SUMF ¶ 31). A MEG officer told Officer Agee that Plaintiff was drunk and asked Agee to run a warrant check on him.  (EP Defs.' SUMF ¶¶ 32-33).  After running the check, Officer Agee discovered that Plaintiff had outstanding warrants from Peoria County.  (EP Defs.' SUMF ¶ 33).

Officer Christopher Hutt, another uniformed East Peoria police officer, joined Officer Agee inside the residence.  The two officers noticed that Plaintiff was highly intoxicated.  They also observed that he was conscious, mumbling, and rolling around on the floor.  (EP Defs.' SUMF ¶¶ 34-35).  In response to the officers' commands to stand up, Plaintiff told the officers that he was unable to stand. Plaintiff has no recollection of these events.[1]

The officers attempted to stand Plaintiff up, but Plaintiff was unable to stand without assistance.  The officers believed that this was due to Plaintiff's intoxication.  (EP Defs.' SUMF ¶ 36).  Neither of the officers called an ambulance or sought any medical care for Plaintiff.  (EP Defs.' SUMF ¶ 40).

---

[1] In his response brief, Plaintiff rebuts the East Peoria Defendants' assertion that he was conscious and mumbling at the time of his arrest.  Plaintiff's rebuttal is based solely on the fact that he does not remember interacting with police officers during his arrest on April 1, 2005.  Plaintiff's failure to recollect the details of his arrest is not surprising, given his intoxication at that time.  Nevertheless, the failure of Plaintiff's memory is not inconsistent with the deposition testimony of Officers Agee and Hutt which indicates that the officers did, in fact, interact with Plaintiff during his arrest.  Accordingly, the Court finds it undisputed that, at the time of his arrest, Plaintiff was conscious, mumbling, and interacting with officers. (EP Defs.' SUMF ¶ 34).

Officers Agee and Hutt lifted Plaintiff from the floor and transported him outside the residence.  Robert Legg and Becky Collins, who were outside the house at the time, witnessed the officers' handling of Plaintiff as he was transported out the front door, down the stairs, through the yard, and into a police vehicle. According to Robert Legg, one officer was on each side of Plaintiff.  Each officer was grabbing Plaintiff by his bicep and his wrist.  Plaintiff's body was limp.  His head was hanging down toward his chin and was bouncing around as the officers moved him.  (11/27/06 Robert Legg Dep. at pp. 26-30; 8/7/07 Robert Legg Dep. at pp. 36-39, 58-59).  Similarly, Becky Collins saw that the two officers had their arms through Plaintiff's upper arms and that they were "dragging him out."  She saw Plaintiff's whole body bouncing around as the officers "dragged" him down the front steps and through the yard.  (EP Defs.' SUMF ¶¶ 48-49).  Neither Robert Legg nor Becky Collins saw Plaintiff's head strike anything while the officers were transporting him.  (EP Defs.' SUMF ¶¶ 50-51).

After removing Plaintiff from the residence, the officers put him in the back of Officer Agee's squad car, and Agee drove Plaintiff to the Tazewell County Jail. (EP Defs.' SUMF ¶¶ 54-55).  Correctional officers at the jail removed Plaintiff from the squad car, but the jail refused to accept Plaintiff because he was intoxicated. Instead, jail officials directed Officer Agee to first take Plaintiff to a hospital for an evaluation.  (EP Defs.' SUMF ¶ 55).

Plaintiff was then transported to Pekin Hospital's emergency room by ambulance.  (EP Defs.' SUMF ¶ 56).  After arriving at the hospital, Plaintiff was

1:05-cv-01354-JBM-BGC   # 95   Page 6 of 22

evaluated by two nurses, one of whom was specifically trained to recognize spinal cord injuries. Both nurses concluded that Plaintiff had no injury. (EP Defs.' SUMF ¶¶ 57-61). Hermene Upchurch, the first nurse to evaluate Plaintiff, concluded that Plaintiff was suffering from acute alcohol intoxication; his blood alcohol level was .254. (EP Defs.' SUMF ¶¶ 59, 70).

Plaintiff was also evaluated at the hospital by Dr. Jon Oakley. During Dr. Oakley's evaluation, Plaintiff joked with the doctor, stating, "there's nothing wrong with me, I'm just drunk." (EP Defs.' SUMF ¶ 65). Dr. Oakley found that Plaintiff did not need further hospitalization and cleared his return to jail. (EP Defs.' SUMF ¶ 69). Plaintiff was discharged from the hospital at 9:20 a.m. on the morning of his arrest.

After Plaintiff's discharge, Officer Agee drove him back to the Tazewell County Jail, where correctional officers took custody of him. (EP Defs.' SUMF ¶¶ 72, 74). Apparently, Plaintiff then dozed off in a holding cell at the jail. When he awoke, he was "hurting everywhere, from [his] head to [his] toes." (EP Defs.' SUMF ¶ 75). Robert Legg, who was jailed at the same facility, could hear Plaintiff asking for help and telling staff that he could not get up or move. (EP Defs.' SUMF ¶ 75). Subsequently, correctional officers and deputies removed Plaintiff from his cell and transported him to the Peoria County Jail by squad car. He arrived there about 8 p.m. on the same day, April 1, 2005. (EP Defs.' SUMF ¶¶ 77-78).

Plaintiff's wife bailed him out of the Peoria County Jail around 9 p.m. that night. (EP Defs.' SUMF ¶ 81). Plaintiff arrived at home, went up the stairs with

6

the assistance of his wife, took a bath, and went to bed.  (EP Defs.' SUMF ¶ 82).
The following morning, Plaintiff complained of losing feeling in his hands and feet.
He had his wife call an ambulance.  Paramedics arrived and directed Plaintiff to
walk to the ambulance, which he did with the assistance of his wife.  (EP Defs.'
SUMF ¶¶ 83-84).

Plaintiff was transported, sitting upright in the ambulance, to OSF Saint
Francis Medical Center.  He was evaluated by neurosurgeon Dr. Williams Hanigan,
who diagnosed him with a "central cord syndrome."  (EP Defs.' SUMF ¶ 86).
According to Dr. Hanigan, this syndrome can be cause by hyperextension or
hyperflexion of the neck.  Dr. Hanigan testified at his deposition that it is possible
that Plaintiff's injury was sustained while he was being handcuffed or while police
officers were transporting him to the squad car outside his brother's residence on
the morning of April 1, 2005.  (EP Defs.' SUMF ¶¶ 87-89).  According to Dr.
Hanigan, it is also quite possible that something else caused the injury.  (EP Defs.'
SUMF ¶ 90).  Fortunately, Plaintiff did not require surgery for the central cord
syndrome.  He has healed well and is participating in normal activities.  (EP Defs.'
SUMF ¶ 95).

On November 14, 2005, Plaintiff filed a complaint in federal court alleging
that Officers Agee and Hutt, as well as certain MEG unit officers, used excessive
force against him during the April 1, 2005 raid on his brother's residence.  Plaintiff
also sued East Peoria Police Chief Edward Papis and the City of East Peoria for
allegedly establishing an unconstitutional policy of encouraging the use of excessive

force by law enforcement officers.  On September 23, 2008, the MEG Defendants filed for summary judgment.  And on September 24, 2008, the East Peoria Defendants filed for summary judgment.

## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the responsibility of informing the Court as to portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The movant may meet this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

Once the movant has met his burden, to survive summary judgment, the "nonmovant must show through specific evidence that a triable issue of fact remains [as to] an issue on which he bears the burden of proof at trial."  Warsco v. Preferred Tech. Group, 258 F.3d 557, 563 (7th Cir. 2001); see also Celotex Corp., 477 U.S. at 322-24.  The non-movant cannot rest upon the allegations in the pleadings or upon conclusory statements in affidavits; he must support his allegations with proper documentary evidence.  Chemsource, Inc. v. Hub Group, Inc., 106 F.3d 1358, 1361 (7th Cir. 1997).  It is not the Court's function to scour the record in search of evidence to defeat a motion for summary judgment.  Instead, the Court relies on the

non-moving party to identify the evidence which creates an issue of triable fact.
Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996).

The Court must "view the record and all inferences drawn from it in the light
most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co.,
883 F.2d 1307, 1312 (7th Cir. 1989). In doing so, the Court is not "required to draw
every conceivable inference from the record – only those inferences that are
reasonable." Bank Leumi Le-Isreal, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991).
Therefore, if the record before the Court "could not lead a rational trier of fact to
find for the non-moving party," then no genuine issue of material fact exists, and
the moving party is entitled to judgment as a matter of law. McClendon v. Indiana
Sugars, Inc., 108 F.3d 789, 796 (7th Cir. 1997) (quoting Matsushita Elec. Indus. Co.
v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

In order for the non-movant to prevail, "there must be evidence on which the
jury could reasonably find for [him]." Brownell v. Figel, 950 F.2d 1285, 1289 (7th
Cir. 1991). However, in ruling on a motion for summary judgment, the Court may
not weigh the evidence or resolve issues of fact; disputed facts must be left for
resolution at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). In
ruling on a motion for summary judgment, the Court must rely only on evidence
that would be admissible at trial. Bombard, 92 F.3d at 562.

## ANALYSIS

As a preliminary matter, the Court denies Plaintiff's motion to strike the
East Peoria Defendants' summary judgment motion. Plaintiff is correct that

Defendants should have complied with the strict terms of the Local Rules regarding the format of undisputed material facts in the motion for summary judgment. However, Defendants' summary judgment motion is otherwise well-organized, and Plaintiff was able to sufficiently respond to it. Therefore, in the interest of efficiency, the Court will not strike the motion.

The Court will first consider Defendants' motion in limine to exclude the testimony of law enforcement expert W. Ken Katsaris because a ruling on that motion is relevant to the Court's decisions on both motions for summary judgment. The Court will then consider the dispositive issues raised in the East Peoria Defendants' motion for summary judgment. Then, the Court will consider the MEG Defendants' summary judgment motion.

Because the Court disposes of all of Plaintiff's federal claims in this Opinion, the Court will dismiss without prejudice Plaintiff's supplemental state law battery claims. The Court need not consider Defendants' motion in limine regarding the testimony of Dr. Collins because it is not necessary to reach the issue of whether Defendants' actions were the cause of Plaintiff's alleged injury.

I.      Defendants' Motion in Limine regarding the Testimony of W. Ken Katsaris

The Court grants Defendants' motion to bar testimony by W. Ken Katsaris that relates to police department policies or standards of police practices. Mr. Katsaris works as a consultant who provides law enforcement training as well as expert services in litigation matters relating to law enforcement. (Katsaris Dep. at

pp. 8-9). Mr. Katsaris indicated at his deposition that he was retained by Plaintiff to testify as an expert on police practices in this matter. (Katsaris Dep. at p. 48).

Defendants challenge Mr. Katsaris' testimony on the ground that it is irrelevant under Federal Rule of Evidence 401. The Court agrees. Testimony regarding the standards of conduct that the law enforcement community has developed for use by its members is irrelevant in determining whether a police officer's conduct is "objectively reasonable" under the Fourth and Fourteenth Amendments. Thompson v. City of Chicago, 472 F.3d 444, 454 (7th Cir. 2006). Accordingly, Mr. Katsaris' testimony regarding police department guidelines, police best practices, internal standards for police conduct, and the like, are inadmissible. The Court will not consider this testimony in ruling on Defendants' summary judgment motions. See Bombard, 92 F.3d at 562 (a party may not rely on inadmissible evidence to oppose a motion for summary judgment).

II.    Plaintiff's Excessive Force Claims against Officers Agee and Hutt

Defendants Agee and Hutt seek summary judgment on Plaintiff's Fourth Amendment excessive force claims against them. Section 1983 claims involving the alleged use of excessive force by law enforcement officers in making an arrest or other "seizure" are analyzed under the Fourth Amendment's "reasonableness" standard. Abdullahi v. City of Madison, 423 F.3d 763, 768 (7th Cir. 2005). The crux of the inquiry is whether the circumstances, viewed as a whole, justified the particular type of seizure that occurred. The test to be applied is not mechanical and does not involve a bright-line rule. Rather, it requires careful consideration of

all the facts and circumstances surrounding the use of force against the plaintiff.  It involves a balancing between the plaintiff's Fourth Amendment rights and the countervailing governmental interests at play.  Id.

Because the inquiry is an objective one, the Court must not consider an officer's underlying intent or motivations in using a given amount of force.  Id.  The reasonableness of a particular use of force must be viewed from the perspective of a reasonable officer on the scene, without reference to hindsight.  Id.  The Court must keep in mind that officers are often required to make quick judgments about the amount of force necessary to detain or control a suspect.

Defendants' first argument is that their handling of Plaintiff cannot be fairly characterized as a use of force.  Defendants contend that they simply carried an intoxicated suspect to a squad car pursuant to an outstanding warrant against him and that their actions did not constitute "force."  The Court disagrees.  It seems to be a product of common sense that an officer's physical carrying-away of an uncooperative suspect from a residence to a police car constitutes a use of force.  While Plaintiff may not have been affirmatively combative with the officers, this fact would not convert the officers' conduct into something less than a use of force.

Defendants next argue that Plaintiff has failed to precisely identify the conduct that constituted excessive force.  Defendants cite to a line of cases in which the Seventh Circuit Court of Appeals recognized a requirement that a plaintiff in an excessive force case must specifically identify the conduct that he alleges to be an exercise of excessive force.  In his response brief, Plaintiff makes clear that, with

respect to Defendants Agee and Hutt, the conduct that he believes to have
constituted a use of excessive force was the officers' handling of him as they
transported him from Robert Legg's residence to the squad car parked outside.
(Ptf.'s EP SJ Resp. Br. at 21-35).  Accordingly, the Court finds that Plaintiff has met
his burden of specifically identifying the force alleged to have been excessive, i.e. the
conduct alleged to have caused his injury.

Because Plaintiff has precisely identified the challenged conduct of Officers
Agee and Hutt, the Court must now reach the question of whether the officers'
handling of Plaintiff was a reasonable use of force under the circumstances.  The
undisputed facts firmly establish that there was nothing unreasonable about the
manner in which the two officers transported Plaintiff from Robert Legg's residence
to the squad car outside.  The Court agrees with Defendants that the differences in
the parties' factual accounts of the incident are merely semantic.   Plaintiff
unsuccessfully attempts to create a fact issue by using buzz-words – most notably
the word "dragged" – to describe a single, undisputed factual scenario.  In the view
of the Court, given the undisputed facts that have arisen in the summary judgment
briefs, no reasonable jury could conclude that Officers Agee and Hutt acted
unreasonably in the constitutional sense.

Because summary judgment analysis requires that the facts and all
reasonable inferences be construed in Plaintiff's favor, the Court focuses on
Plaintiff's version of events.  In Plaintiff's summary judgment response brief, he
attempts to paint a dramatic picture of his journey from the Legg residence to

Agee's squad car.  He relies exclusively on the deposition testimony of eyewitnesses Robert Legg and Becky Collins.  However, the most damaging facts with which Plaintiff has come forward are that Legg and Collins saw the following: the officers "dragging" Plaintiff down the front stairs and through the yard, each officer holding Plaintiff's bicep or upper arm; Plaintiff's head and body bouncing around, limp, as the officers transported him; Plaintiff's neck hanging down and bouncing as the officers transported him; Plaintiff being "manhandled" by the officers.  (11/27/06 Robert Legg Dep. at pp. 26-30; 8/7/07 Robert Legg Dep. at pp. 36-39, 58-59).

Additionally, Plaintiff points to testimony in which Robert Legg seems to claim that he may have seen Plaintiff's head strike a banister on the way out of the house.[2]  However, Robert Legg clarified that piece of testimony in a subsequent deposition, stating that he never actually saw Plaintiff's head strike anything and stating only that such was possible given Plaintiff's limp posture.  (8/7/07 Robert

---

[2] Mr. Legg testified as follows:

Q.  Did you see him hit his head on anything?

A.  I thought he hit his head on the banister when he come down the stairs because I was watching.
 . . . .

Q.  How did he hit his head on the railing?

A.  They was carrying him sideways, and I seen him whack it.  It looked like he whacked it when they was carrying him down because they had to go down sideways.

Q.  They had to go down sideways because they couldn't fit all three of them across the stairs?

A.  That's right.  (11/27/06 Robert Legg Dep. at pp. 29-30).

Legg Dep. at p. 39). The Court finds that Robert Legg's testimony is not sufficient to create an issue of fact as to whether Plaintiff's head stuck a banister during the course of his removal from the residence. Further, even if the testimony were sufficient to create such an issue, it would not change the Court's opinion because Plaintiff has not come forward with sufficient evidence to convince a reasonable jury that the alleged bumping of his head against the railing on the way down the stairs was due to any unreasonable actions by the officers.

As noted above, Plaintiff bases his excessive force claims against Officers Agee and Hutt exclusively on the eyewitness testimony of Robert Legg and Becky Collins. However, in his response to Defendants' version of the material facts, Plaintiff makes every attempt to avoid the details of the deposition testimony given by those two individuals. Instead, Plaintiff clings to the term "dragged" and insists that he was "dragged out by his arms." (Ptf.'s EP SJ Resp. Br. at p. 14). Plaintiff's heavy reliance on buzz-words and indescriptive phrases reflects the weakness of his case.

On closer inspection of Robert Legg's deposition testimony, it is apparent that Robert saw two officers carrying Plaintiff out of the house, one officer on each side of Plaintiff. Each officer supported Plaintiff by holding his bicep and his wrist. Plaintiff's posture was limp. His neck was hanging down toward his chin, and his knees and feet were dragging or dangling. As the officers carried Plaintiff, his waist did not hit the ground. The officers did not drop him. (11/27/06 Robert Legg Dep. at pp. 26-30; 8/7/07 Robert Legg Dep. at pp. 36-39, 58-59).

15

Becky Collins saw the same thing as Robert Legg. She saw two officers, one on each side of Plaintiff. Each officer supported Plaintiff by grabbing his upper arm or the part of his arm near the elbow. Plaintiff's body was bouncing as the officers transported him. Ms. Collins did not see Plaintiff's head hit anything. She did not see the officers punch or kick Plaintiff, but she thought that they treated him roughly. (Rebecca Collins Dep. at pp. 26-31).

The testimony of Robert Legg and Becky Collins is consistent with police officers removing an uncooperative, highly intoxicated individual from a house to a car parked outside. Plaintiff makes much of the fact that the officers let his legs drag on the ground and that his head was bouncing around. But this type of leg-dragging and head-bouncing is common when a highly intoxicated person is being lugged from one location to another. It may be true that the officers could have handled Plaintiff more gently, but no reasonable juror could find that the Fourth Amendment required the officers to be gentler. See Thompson, 472 F.3d at 454-55.

III.  Denial of Medical Care Claim against Officers Agee and Hutt

Plaintiff's next argument is that it was constitutionally unreasonable for Officers Agee and Hutt to try to move him from the floor of his brother's residence in the first place. Plaintiff seems to claim that he was in the midst of a medical emergency, due to his intoxication, when officers arrived at Robert Legg's residence on April 1, 2005. According to this line of argument, the officers' only reasonable course of action would have been to call paramedics and otherwise refrain from handling Plaintiff. In connection with this argument, Plaintiff claims that Officers

Agee and Hutt violated the Fourth Amendment under a denial of medical care theory when the officers failed to call paramedics.

Defendants argue that Plaintiff waived his denial of medical care claim by failing to include it in the First Amended Complaint ("Complaint"). The Complaint is, indeed, poorly drafted; it does not make clear that Plaintiff is alleging a Fourth Amendment violation under a denial of medical care theory. "[P]oorly-drafted complaints lead to confusing dispositive motions and to chaotic trials." Imperial Const. Mgmt. Corp. v. Laborers Int'l Union of N. Am. Local 96, 1990 WL 139052, at *2 (N.D. Ill. Sept. 17, 1990). It is at least questionable whether, with respect to the medical care claim, the Complaint is specific enough to comply with Federal Rule of Civil Procedure 8(a). Nevertheless, because Plaintiff did allege a general Fourth Amendment violation in the Complaint and because Defendants seem to have been able to sufficiently brief the Court on the medical care claim, the Court will consider the claim on the merits.

A plaintiff's section 1983 claim that alleges denial of medical care at the time of his arrest is governed by the Fourth Amendment's ban on unreasonable seizures. Sides v. City of Champaign, 496 F.3d 820, 828 (7th Cir. 2007). The crux of the inquiry is whether the officers acted reasonably under the circumstances. Williams v. Rodriguez, 509 F.3d 392, 403 (7th Cir. 2007). The following factors are relevant: (1) the officers' notice of the arrestee's medical need; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests. Id.

In the present case, all factors cut against Plaintiff and in favor Defendants such that the Court finds, as a matter of law, Officers Agee and Hutt did not act unreasonably in denying immediate medical attention to Plaintiff on the morning of April 1, 2005.  First, nothing in the record indicates that the officers had reason to believe that if they did not call paramedics in to attend to Plaintiff at the Legg residence, Plaintiff's life or long-term health would be threatened.  From the perspective of a reasonable officer on the scene, Plaintiff appeared to be asleep or passed-out on the floor, still very drunk from the previous night's binge.  Officers Agee and Hutt noticed that Plaintiff was conscious, mumbling, and rolling around on the floor in the living room.  (EP Defs.' SUMF ¶¶ 34-35).  And it is uncontroverted that Plaintiff was lucid enough to tell the officers that he was unable to stand up on his own.  (EP Defs.' SUMF ¶ 34).   No evidence suggests that Plaintiff or his family members indicated to the officers that he needed medical attention.

As to the second and third factors to be considered, there is nothing in the record indicating that Plaintiff was ever, in fact, in serious need of medical attention due to his intoxication.  It is true that Plaintiff was taken to the Pekin Hospital's emergency room after his arrest, but this was done only because the Tazewell County Jail refused to accept him in an intoxicated state without a medical evaluation.  (EP Defs.' SUMF ¶ 55).  It is undisputed that Plaintiff did not complain of any injury to Dr. Oakley, who examined him at the hospital.  (EP Defs.' SUMF ¶ 64).  In fact, Plaintiff joked with Dr. Oakley, stating, "there's nothing

wrong with me, I'm just drunk."  (EP Defs.' SUMF ¶ 65).  Plaintiff's blood alcohol level was high (EP Defs.' SUMF ¶ 70), but ultimately, Dr. Oakley decided that Plaintiff did not need to be hospitalized.  (EP Defs.' SUMF ¶ 69).

Moving on to the fourth factor, Officers Agee and Hutt had a duty to take Plaintiff into custody because he was wanted on outstanding warrants.  (EP Defs.' SUMF ¶ 33).  It may have been one reasonable course of action for the officers to have called an ambulance to transport Plaintiff from the Legg residence.  It may have even been the better option.  However, under the circumstances, no reasonable jury could find that Agee and Hutt violated minimum constitutional standards by failing to call for an ambulance or by failing to otherwise administer medical aid to Plaintiff.

IV.    Claim of Unconstitutional Custom or Policy of the City of East Peoria

In his response brief, Plaintiff concedes that he cannot establish the existence of an unconstitutional custom or policy of the City of East Peoria that relates to the facts of this lawsuit.  Plaintiff also concedes that Defendant Papis was not personally involved in the police actions underlying this suit.  Accordingly, the Court grants summary judgment to Defendants Papis and the City of East Peoria on Plaintiff's constitutional claims.

V.    Excessive Force Claims against Officers Gorsuch, Hawkins, Drummond, Legate, McElyea, King, and Jones

Plaintiff expressly concedes summary judgment to Defendants Gorsuch, Hawkins, Drummond, McElyea, King, and Jones.  Plaintiff, however, identifies Kevin Legate as an officer who exerted excessive force upon him inside Robert

Legg's residence on April 1, 2005 in violation of the Fourth and Fourteenth Amendments.  (Ptf.'s MEG SJ Resp. Br. at p. 2).  In opposition, Officer Legate argues that there is insufficient evidence to place him as the officer who handcuffed Plaintiff.  Alternately, Officer Legate argues that he is shielded from liability by the doctrine of qualified immunity.

In the Court's opinion, even assuming that Officer Legate was the officer who put his knee to Plaintiff's back, pulled Plaintiff's hands behind his back, and cuffed Plaintiff, this conduct was not unreasonable under the circumstances.  First, it is per se reasonable for an officer to detain an occupant of a residence while the premises are searched pursuant to a search warrant for contraband.  Michigan v. Summers, 452 U.S. 692, 705 (1981).  Therefore, there was nothing unreasonable about the officer's decision to detain Plaintiff.

Second, with respect to the manner in which Plaintiff was detained, the evidence presented only supports the contention that the cuffing officer had Plaintiff pinned down with his knee to his upper back.  Plaintiff points to the deposition testimony of Katie Legg and Robert Legg, who were eyewitnesses to the alleged handcuffing.  At her deposition, Katie Legg testified that she saw an officer with his knee to the top of Plaintiff's back, near the shoulder blades.  (Katie Legg. Dep. at pp. 18-19).  Similarly, Robert Legg testified that he saw an officer with his knee somewhere in the area by Plaintiff's neck or on his shoulder blades.  (11/27/06 Robert Legg Dep. at p. 24).  Neither of these pieces of testimony could convince a

reasonable juror that the handcuffing officer acted unreasonably in securing Plaintiff during the course of a properly authorized police raid.

If there was evidence that Officer Legate had punched, kicked, or otherwise beaten Plaintiff, this would be a different case.  But Plaintiff has not offered any such evidence.  If it were a constitutional violation for an officer to pin down an occupant of a residence during a police drug raid, it would be difficult for task forces such as the MEG unit to function effectively and in a manner that protects officer safety.  Accordingly, the Court finds that, even under Plaintiff's version of events, Officer Legate did not use excessive force in detaining Plaintiff and did not violate the Fourth Amendment.

Alternatively, the Court finds that Officer Legate is shielded from liability by the doctrine of qualified immunity.  Plaintiff has not carried his burden of showing that a reasonable officer in Officer Legate's shoes on April 1, 2005 would have been on notice that the manner in which he detained Plaintiff violated the Fourth Amendment.  See Erwin v. Daley, 92 F.3d 521, 525 (7th Cir. 1996); see also Summers, 452 U.S. at 705.  Accordingly, the Court grants summary judgment to Officer Legate on Plaintiff's excessive force claim.

VI.    State Law Battery Claims against Officers Agee and Hutt, Police Chief Papis, and the City of East Peoria

The only remaining claims are Plaintiff's state law battery claims.  In the Seventh Circuit, it is the usual practice of courts to dismiss, without prejudice, state law supplemental claims when all federal claims have been dismissed prior to trial. Groce v. Eli Lilly & Co., 193 F.3d 496, 501 (7th Cir. 1999).  Accordingly, the battery

claims are dismissed without prejudice, and Plaintiff is directed to file them in state court.

VII.   <u>Defendants' Motion in Limine regarding the Testimony of Dr. Collins</u>

In light of the Court's rulings in this Opinion, the issue of causation need not be decided. Accordingly, the testimony of Dr. Collins need not be considered, and Defendants' motion in limine to exclude the doctor's testimony is moot.

## CONCLUSION

Plaintiff's motion to strike is DENIED; Defendants' motion in limine regarding the testimony of Mr. Katsaris is GRANTED; the motion for summary judgment filed by the East Peoria Defendants is GRANTED, in part, and Plaintiff is directed to file his remaining state law battery claims in state court; the motion for summary judgment filed by the MEG Defendants is GRANTED; and Defendants' motion in limine regarding the testimony of Dr. Collins is MOOT.

CASE TERMINATED.

ENTERED this <u>5th</u> day of January, 2009.

<u>s/ Joe B. McDade</u>
JOE BILLY MCDADE
United States District Judge
